**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Thomas L. Long
Mark A. Kornfeld
Michelle R. Kaplan
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. _____ (BRL) |
| Plaintiff, | |
| v. | **COMPLAINT** |
| LOMBARD ODIER DARIER HENTSCH & CIE, | |
| Defendant. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, for this Complaint against Lombard Odier Darier Hentsch & Cie ("Lombard Odier"), alleges the following:

## I. NATURE OF THE ACTION

1. This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property[1] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

2. With this Complaint, the Trustee seeks to recover approximately $179,432,380 in subsequent transfers of Customer Property made to Defendant Lombard Odier. The subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry Limited ("Fairfield Sentry") and Kingate Global Fund Ltd. ("Kingate Global"), which were Madoff feeder funds (collectively, the "Feeder Funds"). The Feeder Funds are British Virgin Islands ("BVI") companies that are in liquidation in the BVI. The Feeder Funds had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS. Each of the Feeder Funds maintained in excess of 95% of its assets in its BLMIS customer accounts. Some of the subsequent transfers from Fairfield Sentry came through Fairfield Sigma Limited ("Fairfield Sigma"), which invested 100% of its assets in Fairfield Sentry. Fairfield Sigma also is in liquidation in the BVI.

---

[1] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

3. When Defendant Lombard Odier received the subsequent transfers of BLMIS Customer Property, Defendant Lombard Odier was a global banking and wealth management institution offering a wide range of financial advisory services to private and institutional clients.

## II. JURISDICTION AND VENUE

4. The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by Defendant Lombard Odier as a subsequent transferee of funds originating from BLMIS.

5. This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

6. Defendant Lombard Odier is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Feeder Funds. Defendant Lombard Odier knowingly received subsequent transfers from BLMIS by withdrawing money from the Feeder Funds.

7. By directing its investments through Fairfield Sentry and Fairfield Sigma, both Fairfield Greenwich Group ("FGG") managed feeder funds, Defendant Lombard Odier

2

knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York. Upon information and belief, Defendant Lombard Odier entered into a subscription agreement with Fairfield Sentry under which it submitted to New York jurisdiction, sent a copy of the subscription agreement to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York. Defendant Lombard Odier also regularly communicated by e-mail and letters with its FGG account representatives located in FGG's New York City office. Defendant Lombard Odier thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

8. Defendant Lombard Odier should reasonably expect to be subject to New York jurisdiction, and is subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

9. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

10. Venue in this District is proper under 28 U.S.C. § 1409.

### III. BACKGROUND

11. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

12. On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

3

13. On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

14. Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

    a. removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

    b. appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

    c. removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

15. By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

16. At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id*. at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing

4

[was] wrong, indeed criminal." *Id*. On June 29, 2009, Madoff was sentenced to 150 years in prison.

17. On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id*. at 46.

## IV. TRUSTEE'S POWERS AND STANDING

18. As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

19. Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

5

20.  Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

21.  The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V.    THE DEFENDANT

22.  Defendant Lombard Odier is a Swiss limited partnership that maintains a place of business at Rue de la Corraterie 11, 1204 Geneva, Switzerland.

## VI.   THE PONZI SCHEME

23.  BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

24.  Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted

6

that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

25. The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

26. BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

27. Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than

7

through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

28. For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

29. The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

30. It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

31. Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

32. Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had

8

approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

33.     Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## VII.    THE TRANSFERS

34.     The Feeder Funds received initial transfers of BLMIS Customer Property. Some or all of those transfers were subsequently transferred directly or indirectly to Defendant Lombard Odier.

### A.    FAIRFIELD SENTRY

#### 1.    Initial Transfers from BLMIS to Fairfield Sentry

35.     The Trustee has filed an adversary proceeding against Fairfield Sentry, Fairfield Sigma, and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover the initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

36.     During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers"). The

Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

37. The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

38. The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

39. The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are attached as Exhibits A and B.

40. Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the

Bankruptcy Court entered a consent judgment granting the Trustee a judgment against Fairfield Sentry in the amount of $3,054,000,000. Fairfield Sentry is obligated to pay $70,000,000 to the Trustee under the terms of the Settlement Agreement.

### 2. Subsequent Transfers from Fairfield Sentry to Defendant Lombard Odier

41. A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Lombard Odier and is recoverable from Defendant Lombard Odier pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $95,595,385 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Lombard Odier (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

42. The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### 3. Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to Defendant Lombard Odier

43. A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Lombard Odier through Fairfield Sigma and is recoverable from Defendant Lombard Odier pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma. Thereafter, the equivalent of approximately $1,279,986 was transferred by Fairfield Sigma to Defendant Lombard Odier (the

11

"Fairfield Sigma Subsequent Transfers"). Charts setting forth the presently known Fairfield Sigma Subsequent Transfers are attached as Exhibits D and E.

44. The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sigma Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

45. The Fairfield Sentry Subsequent Transfers and the Fairfield Sigma Subsequent Transfers are collectively defined as the "Fairfield Subsequent Transfers."

### B.     KINGATE GLOBAL

#### 1.     Initial Transfers from BLMIS to Kingate Global

46. The Trustee has filed an adversary proceeding against Kingate Global and other defendants in the Bankruptcy Court under the caption *Picard v. Kingate Global Fund Ltd., et al.*, Adv. Pro. No. 09-01161 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate Global in the amount of approximately $437,501,112 (the "Kingate Global Complaint"). The Trustee incorporates by reference the allegations contained in the Kingate Global Complaint as if fully set forth herein.

47. Over the lifetime of Kingate Global's account with BLMIS, from its inception to the Filing Date, BLMIS made transfers to Kingate Global of approximately $437,501,112 (the "Kingate Global Lifetime Initial Transfers"). The Kingate Global Lifetime Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

48. The Kingate Global Lifetime Initial Transfers include approximately $398,704,065 which BLMIS transferred to Kingate Global during the six years preceding the

12

Filing Date (the "Kingate Global Six Year Initial Transfers"). The Kingate Global Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

49. The Kingate Global Six Year Initial Transfers include approximately $163,447,509 which BLMIS transferred to Kingate Global during the two years preceding the Filing Date (the "Kingate Global Two Year Initial Transfers"). The Kingate Global Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

50. The Kingate Global Two Year Initial Transfers include approximately $101,753,145 which BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers"). The Kingate Global Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

51. The Kingate Global Lifetime Initial Transfers, the Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate Global Initial Transfers." Charts setting forth these transfers are attached as Exhibits F and G.

### 2. Subsequent Transfers from Kingate Global to Defendant Lombard Odier

52. A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Lombard Odier and is recoverable from Defendant Lombard Odier pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $82,557,009 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Lombard Odier (the "Kingate Global Subsequent Transfers"). A chart setting forth the presently known Kingate Global Subsequent Transfers is attached as Exhibit H.

53. The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, the Kingate Global Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

## COUNT ONE
## RECOVERY OF FAIRFIELD SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

54. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

55. Defendant Lombard Odier received the Fairfield Sentry Subsequent Transfers, totaling approximately $95,595,385, and the Fairfield Sigma Subsequent Transfers, totaling the equivalent of at least $1,279,986 (collectively, as defined above, the "Fairfield Subsequent Transfers"). The Fairfield Subsequent Transfers, totaling approximately $96,875,371, are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

56. Each of the Fairfield Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant Lombard Odier.

14

57. Defendant Lombard Odier is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers.

58. As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Lombard Odier recovering the Fairfield Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## RECOVERY OF KINGATE GLOBAL SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

59. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

60. Defendant Lombard Odier received the Kingate Global Subsequent Transfers, totaling approximately $82,557,009, which are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

61. Each of the Kingate Global Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant Lombard Odier.

62. Defendant Lombard Odier is an immediate or mediate transferee of the Kingate Global Initial Transfers.

63. As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Lombard Odier recovering the Kingate Global Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendant Lombard Odier as follows:

15

(a)     On the First Claim for Relief, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Lombard Odier recovering the Fairfield Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $96,875,371, for the benefit of the estate of BLMIS;

(b)     On the Second Claim for Relief, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Lombard Odier recovering the Kingate Global Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $82,557,009, for the benefit of the estate of BLMIS;

(c)     Awarding the Trustee all applicable fees, interest, costs, and disbursements of this action; and

(d)     Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated:  June 6, 2012
        New York, New York

/s/ David J. Sheehan
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Mark A. Kornfeld
Thomas L. Long
Michelle R. Kaplan
Torello H. Calvani

16